## S08A1221. McNEIL v. THE STATE.
(669 SE2d 111)

MELTON, Justice.

Following a jury trial, John G. McNeil was found guilty of aggravated assault and felony murder in connection with the shooting death of Brian Epp.[1] On appeal, McNeil contends that the evidence was insufficient to sustain his conviction, that the trial court erred in failing to include on the verdict form a requirement that the jury determine whether justification existed as to each count, that the trial court erred in its pattern jury instructions on

---

[1] On September 28, 2006, McNeil was indicted for malice murder, felony murder (with aggravated assault as the underlying felony), aggravated assault, and voluntary manslaughter. Following a jury trial on October 30-November 6, 2006, McNeil was found guilty of felony murder and aggravated assault, but was acquitted of murder and voluntary manslaughter. On November 8, 2006, McNeil was sentenced to life imprisonment for felony murder, and the trial court merged the aggravated assault count with the felony murder count for sentencing purposes. McNeil's motion for new trial was filed on November 30, 2006, and was amended on February 9, 2007. The motion was denied on October 5, 2007. McNeil was granted an out-of-time appeal on February 29, 2008, and he filed his appeal in the Court of Appeals. McNeil's appeal was transferred from the Court of Appeals to this Court on April 1, 2008. His appeal was docketed in this Court on April 3, 2008, and orally argued on June 30, 2008.

aggravated assault and felony murder, that the trial court erred in failing to recharge the jury on justification and self-defense, and that McNeil was denied his constitutional right to due process due to the State's use of aggravated assault as the underlying felony to support the felony murder charge in the indictment. Finding no error, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence reveals that, in September 2005, McNeil contracted to buy an unfinished home from Epp Elevations, a small building company owned by Epp and his wife. On December 6, 2005, Epp went to McNeil's house to complete required work. McNeil's son, La'Ron, was home and called McNeil to report that someone was in the backyard. Believing that Epp was a trespasser, La'Ron confronted Epp and asked him to leave, and an argument ensued during which Epp pointed a knife at La'Ron. La'Ron called McNeil to report this incident to him.

In response, McNeil headed home in his car. On the way back he reported to an emergency 911 operator that a man was on his property and had pulled a knife on his son. Moments later, McNeil told the operator, "I'm at the property now . . . and there's the builder and I may get ready to whip his ass right now. So get the cops here now." As McNeil was pulling into his driveway, he retrieved an automatic handgun from his car's glove compartment, removed it from its case, and loaded it with ammunition.

An eyewitness who was across the street heard McNeil and Epp arguing loudly. A few minutes later he heard a loud pop and saw smoke and McNeil pointing his hand toward the ground and stepping backward. Epp was in the yard between McNeil's house and the one next door and walking toward McNeil. McNeil continued to back up with his hands pointed toward the ground and said "Back up, I am not playing with you." Epp increased his speed toward McNeil and McNeil raised his gun and fired at Epp's head. Epp's hands were at his sides, and the eyewitness did not see him raise his hands or see any weapons in his hands.

Later, an officer arrived at the scene and found Epp on the ground with a fatal gunshot wound to the head. McNeil informed the officer that Epp had pulled a knife on him and then McNeil shot him. The officer saw a knife clipped inside the right hand pocket of Epp's pants. A forensic investigator from the Cobb County Medical Examiner's Office also responded to the scene and noticed that the knife in Epp's pocket was folded. Dr. Brian Frist, the Chief Medical Examiner of Cobb County, later determined that the abrasions on Epp's face indicated that he had been shot at a distance of less than three feet. There were no abrasions on Epp's hands to indicate that he had raised his hands to defend himself.

The evidence was sufficient to enable a rational trier of fact to find McNeil guilty of all of the crimes for which he was convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also, e.g., *Jolley v. State*, 254 Ga. 624 (1) (331 SE2d 516) (1985) (despite claim of self-defense, evidence supported felony murder conviction based on aggravated assault where defendant retrieved pistol in anticipation of confrontation and told victim to leave before shooting him). Indeed, from the evidence presented, the jury was authorized to conclude that McNeil decided to confront Epp with the specific purpose of "whip[ping] his ass" before Epp even knew that McNeil was on his way to the scene; that McNeil had time to stop in his driveway, retrieve a gun from his glove compartment, take the gun out of its case, load it, exit from his car, and "argue loudly" with Epp for a few minutes before firing the first shot at him; and that McNeil lied to police when he claimed that he had shot Epp because Epp had "pulled a knife on him" during the confrontation (because other eyewitness testimony showed that Epp had no weapon in his hands at the time of the shooting, and further testimony showed that Epp's knife was folded and in his pocket after he had been shot). Because "[w]itness credibility is a matter to be determined by the jury, as is the question of justification; . . . the jury was free to accept the evidence that the shooting[ ] [was] not done in self-defense . . . and to reject any evidence offered by [McNeil] in support of a justification defense." (Citation omitted.) *Harris v. State*, 279 Ga. 304, 306 (2) (612 SE2d 789) (2005). As sufficient evidence existed to support the conclusion that McNeil committed the offense of aggravated assault, and felony murder predicated on that aggravated assault, there is no basis for overturning the jury's verdict here.[2]

2. McNeil contends that the trial court erred by failing to include on the verdict form a requirement that the jury determine whether justification was found as to each count. However, the record reveals that McNeil's counsel specifically informed the trial court that he had "no objection to the [verdict] form as is," without any changes having to be made to it. McNeil has therefore waived review of this

---

[2] While evidence was presented that would have authorized the jury to reach a different result such as that outlined by the dissent by focusing solely on Epp's alleged aggression, the jury was free to reject that version of the facts and instead focus on the evidence reflecting McNeil's aggression. In reaching its conclusion, the dissent has reweighed the evidence and reassessed the credibility of the witnesses presented at trial. This Court, however, is forbidden from reassessing the evidence in such a manner on appeal, as "resolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the factfinder, not this Court." (Citation and punctuation omitted.) *Dean v. State*, 273 Ga. 806, 807 (1) (546 SE2d 499) (2001).

issue on appeal. *Jones v. State*, 279 Ga. 854 (7) (a) (622 SE2d 1) (2005).

3. Similarly, McNeil has waived the specific issue that he attempts to raise on appeal with respect to the pattern jury charges on aggravated assault and felony murder. Although McNeil's counsel purported to reserve a general objection to the jury charges below, he also specifically informed the trial court that he was "solid on" and had no objection to "any pattern charges." Indeed, even where there is no "general waiver of the right to urge error in any of the trial court's charges . . . a defendant will not be allowed to take inconsistent positions, originally urging in the trial court that a charge is not error, but subsequently urging on appeal that the charge is error." *Roulain v. Martin*, 266 Ga. 353, 354 (2) (466 SE2d 837) (1996). Because McNeil acquiesced to the use of the pattern charges below, he cannot now complain on appeal that the use of the pattern charges was erroneous. See id.

4. McNeil argues that the trial court erred in failing to recharge the jury as to justification and self-defense upon his request. The record reveals, however, that the jury requested a recharge on malice murder and voluntary manslaughter only, which the trial court gave. "When a jury requests a recharge on a particular point, the trial court has the discretion to recharge in full or only as to the points requested. [Cit.]" *Johnson v. State*, 281 Ga. 770, 773 (3) (642 SE2d 827) (2007). The trial court did not abuse its discretion by declining defense counsel's request that the court also recharge the jury on justification and self-defense. Id.

5. McNeil's contention that an aggravated assault charge cannot be used as the underlying felony to support a conviction for felony murder is without merit, as this Court has already decided that the use of an aggravated assault charge in this manner is proper. *Baker v. State*, 236 Ga. 754 (1) (225 SE2d 269) (1976).

*Judgment affirmed. All the Justices concur, except Sears, C. J., who dissents.*

SEARS, Chief Justice, dissenting.

Because my examination of the record shows that the State failed to disprove John McNeil's claim of self-defense beyond a reasonable doubt, I respectfully dissent to the Court's affirmance of McNeil's conviction for murder.

1. The evidence shows that in the fall of 2005, the victim, Brian Epp, was building two houses on neighboring lots on Earlvine Way in Kennesaw, Georgia. One of the houses, a $450,000 custom home, was for McNeil and his wife, Anita McNeil. Ms. McNeil testified that, because they had had numerous difficulties with Epp, they decided to close on the house early in order "to have [Epp] out of [their] lives."

According to Ms. McNeil, at the closing on November 8, 2005, the parties agreed that Epp would complete certain work within ten days of the closing, would lose certain money if he did not complete the work, and would not come on the property after the ten-day period expired. Epp did not complete the work.

La'Ron McNeil ("La'Ron"), the McNeils' son, was nineteen years old at the time of the shooting. La'Ron testified that, on December 6, 2005, he was at the family's home at 505 Earlvine Way to meet some men to do some work. He said that he saw a man he did not recognize walking in the backyard of the house and called his father. McNeil told his son to ask the person to leave the property. La'Ron then went outside and asked the man, who was the victim Epp, to leave the property. Epp refused to do so, and La'Ron stated that they were arguing, standing about three or four feet from each other. McNeil was still on the phone with La'Ron and recognized that Epp was the man with whom La'Ron was arguing. La'Ron testified that, as he and Epp were arguing, Epp pulled out a folding utility knife, pointed it at La'Ron's face, and stated "[w]hy don't you make me leave?" La'Ron told his father that Epp had pulled a knife on him, and his father told La'Ron to go into the house and that he (McNeil) would call 911. Other evidence presented at trial shows that McNeil did, in fact, call 911 immediately.

La'Ron added that he then went into the house and that he saw his father pull into the driveway shortly thereafter. According to La'Ron, Epp had gone to the next door neighbor's house where Epp was doing some work. La'Ron testified that he saw Epp reach into his truck and put something into his pocket and "rush[ ]" toward the McNeils' driveway. At that point, La'Ron went to the front door to go outside, but before he could do so, he heard, but did not see, gunshots.

McNeil testified that, after he spoke with La'Ron, he called 911 and told the operator that a man that he thought was his builder was on his property and had pulled a knife on his son. When McNeil pulled into his driveway, he was still on the phone with the 911 operator and told her he saw the builder and was going to "whip his ass." McNeil added that, when he pulled into his driveway, Epp was standing in the next door neighbor's driveway leaning on his truck. McNeil said that, when Epp saw him, Epp opened the door of his truck, reached in, grabbed something out, and stuck it in his right pocket before moving toward him. According to McNeil, he got his gun out of the glove compartment and showed it to Epp, who was coming toward him "fast." McNeil testified that he then quickly jumped out of his car, leaving the car door open, and kept telling Epp to back up. Epp, however, kept coming and saying "come on." McNeil testified that he kept backing up, fired a warning shot, and

told Epp that he did not want to hurt him. When Epp kept coming, McNeil raised his arm and fired the gun.

On cross-examination, McNeil admitted that, when he pulled into his driveway, the gun was in its case in his glove compartment and was unloaded. He added that he had to get the gun out of the glove compartment, open the case, and put a magazine in the bottom of the gun. He testified, however, that he was able to do that by the time he got out of his car and walked around it.

Bobby Smith testified that he was detailing a Ferrari in a driveway across the street from where the shooting occurred. He stated that he heard McNeil and Epp arguing loudly and that he then heard a pop that sounded like a firecracker. Smith looked across the street and "saw [McNeil] pointing his hands [and a gun] toward the ground and waving and stepping backwards." Smith added that Epp was in the yard between McNeil's house and a neighbor's house; that Epp kept walking "up the yard into [McNeil's] driveway"; and that McNeil was "backing up with his hands towards the ground." According to Smith, McNeil told Epp to "back up, I'm not playing with you." Smith testified that Epp then increased his speed toward McNeil and that McNeil then raised his gun and shot Epp in the head. Smith added that Epp did not ever raise his hands and that he did not see a weapon on Epp.

Officer John Friedlander of the Cobb County Police Department testified that he received a call from dispatch directing him to go to the location of the crime because of a dispute between a homeowner and a builder. Friedlander testified that he arrived at the scene within several minutes of the call and that, at that time, Epp had been shot in the head and McNeil and his son were standing in the driveway. McNeil told Friedlander that Epp had pulled a knife on him and that he had shot him. Officer Friedlander testified that he found a folding knife in the right pocket of Epp's pants. Forensic evidence showed that Epp had been shot from a distance of less than three feet and that there was no stippling on his hands, thus indicating that they were not raised when he was shot.

Brad McEntyre, a detective in the homicide unit of the Cobb County Police Department, was the lead detective in the case and testified as a defense witness. He stated that phone company records confirmed that McNeil and his son had talked shortly before the 911 call and that he made the decision not to arrest McNeil.

David Samson testified that he and his wife, Libby Jones, had contracted with Epp to build them a home in April 2004, that they ran into numerous problems with Epp, and that they fired him in December 2004. They had a lawyer write Epp a letter informing him that, if he came on the property, it would be considered a trespass. Shortly after Epp received the letter, he came onto the property and

told some men installing an air-conditioning unit to cut the wires and to haul the unit off the property. Samson testified that he told Epp he was trespassing and to leave the property and that Epp told him to "shut up" and started screaming at the air-conditioning workers to get "the equipment out of here." Samson said he told Epp that he would call 911, that Epp told him to do so, and that Samson called 911 and a police unit responded. Samson also testified that, at a weekly status meeting with Epp in October 2004, Epp became irate at Jones when she expressed dissatisfaction with Epp, that Epp rushed up to Jones and raised his hands in the air, that Epp stated that he did not "need to take this shit," and that Epp then ran out of the house. Jones testified that she thought Epp was going to hit her when he raised his hands, that she and her husband had an attorney write Epp a letter stating that his behavior was unacceptable, and that, thereafter, she would not meet with Epp alone.

Samson further testified that he became so concerned about Epp's behavior that he always took a gun with him when he went to the house. In explaining the need for the gun, Samson testified as follows:

> When we first met [Epp], he was fine, everything was okay. As we started encountering problems with the construction, we ran into some very significant problems, [and] that is when the hostility started coming out. And that started escalating. And it got to the point where my wife and I were in total fear of this man. And so after we terminated him, I did not know what he was capable of doing. . . . Just as a precaution, I carried the gun.

Samson added that, after he terminated Epp, Epp would park his car across from his property and would sit and watch what was going on at the house.

Samson and Jones also testified that, in October 2005, the McNeils came to speak with them about problems they were having with their house. At that point, Samson and Jones were involved in litigation with Epp and told the McNeils that they could not talk about specific problems with Epp. They did counsel the McNeils that they should "just finish the house, go to the closing," and let the agent "deal with everything else" and "do all the talking."

2. Under OCGA § 16-3-21 (a), McNeil was justified in shooting Epp "only if he . . . reasonably believe[d] that such force [wa]s necessary to prevent death or great bodily injury to himself . . . or to

prevent the commission of a forcible felony.''[3] At trial, the State had the burden to disprove NcNeil's affirmative defense of justification beyond a reasonable doubt.[4] On appeal, in reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict, and determine whether a rational trier of fact could have found the absence of self-defense beyond a reasonable doubt.[5] I conclude that, viewing the evidence in the light most favorable to the verdict, no rational trier of fact could have found the absence of self-defense beyond a reasonable doubt.

At the outset, I note that McNeil was not under a duty to retreat either when he drove onto his property or when Epp charged him by coming from the neighbor's property onto McNeil's property.[6] Although the majority correctly states that McNeil told the 911 operator that he wanted to ''whip [Epp's] ass'' and that McNeil retrieved a gun from his glove compartment,[7] in analyzing whether the evidence is sufficient to support the verdict, the majority fails to acknowledge that the undisputed evidence shows that the shooting occurred on McNeil's property, that McNeil never left his property, that Epp was on a neighbor's property when McNeil drove into his driveway, and that Epp left the neighbor's property and crossed over the neighbor's yard and onto McNeil's property. As for whether McNeil could have reasonably believed that deadly force was necessary,[8] the majority also fails to acknowledge that Bobby Smith, a neutral witness, testified that McNeil was on his property and in his driveway when Epp began approaching him from the neighbor's yard. Smith added that McNeil fired a shot into the ground and verbally warned Epp not to come any closer. According to Smith, despite these warnings, Epp increased his speed in moving toward McNeil. McNeil's son testified that Epp pulled a knife on him in his own backyard, that he told his father this, and that Epp rushed at McNeil from the next door neighbor's yard. McNeil gave testimony that was similar in relevant respects to that given by his son and Smith, and he added that Epp reached into his truck and put something in his right pocket before he rushed toward McNeil and onto his property.

---

[3] OCGA § 16-3-21 (a).

[4] *Diaz v. State*, 270 Ga. 421, 421-422 (510 SE2d 529) (1999); *Andrews v. State*, 267 Ga. 473, 474 (480 SE2d 29) (1997).

[5] See *Quillian v. State*, 279 Ga. 698, 699 (620 SE2d 376) (2005).

[6] *Johnson v. State*, 253 Ga. 37, 37-39 (315 SE2d 871) (1984); OCGA § 16-3-23.1.

[7] In reviewing the sufficiency of the evidence in the present case, I am not, as alleged by the majority, re-weighing the evidence. Instead, I am carrying out my duty to review the evidence under the constitutional standard set forth by the United States Supreme Court.

[8] OCGA § 16-3-21 (a).

McNeil's call to 911 reporting that Epp had pulled a knife on his son supports the veracity of La'Ron's and McNeil's testimony. Significantly, the police did find a knife in Epp's right pocket. Further supporting the testimony of McNeil, his son, and Smith that Epp was the aggressor was the testimony of David Samson and Libby Jones to the effect that Epp had behaved in an extremely aggressive and inappropriate manner toward them concerning problems with Epp's work on their house. Although the State had the burden to disprove self-defense, the State did not offer any evidence to rebut McNeil's evidence that Epp was the aggressor, that Epp came onto McNeil's property from a neighbor's yard despite being told previously that he did not have permission to do so, that McNeil knew that Epp had threatened to stab his son moments earlier, and that Epp had a knife on his person when he charged McNeil.[9] In fact, the only witness called by the State who actually saw the shooting, Bobby Smith, gave testimony that actually supported McNeil's evidence that Epp was the aggressor.

Even viewed in the light most favorable to the verdict, the evidence was overwhelming in showing that a reasonable person in McNeil's shoes would have believed that he was subject to an imminent physical attack by an aggressor possessing a knife and that it was necessary to use deadly force to protect himself from serious bodily injury or a forcible felony.[10] Under the facts of this case, it would be unreasonable to require McNeil to wait until Epp succeeded in attacking him, thereby potentially disarming him, getting control of the gun, or stabbing him before he could legally employ deadly force to defend himself. This is not what Georgia law requires. To the contrary,

> [i]t is not essential to justify a homicide that there should be an actual assault made upon th[e] defendant. Threats accompanied by menaces, though the menaces do not amount to an actual assault, may in some instances be sufficient to arouse a reasonable belief that one's life is in imminent danger or that one is in imminent danger of great bodily harm or that a forcible felony is about to be committed upon one's person.[11]

---

[9] See *Diaz v. State*, 270 Ga. at 421-422 (State has the burden to disprove a defendant's affirmative defense of justification beyond a reasonable doubt).

[10] Our Criminal Code defines a forcible felony as "any felony which involves the use or threat of physical force or violence against any person." OCGA § 16-1-3 (6).

[11] *Bennett v. State*, 265 Ga. 38, 40 (453 SE2d 458) (1995). Accord *Koritta v. State*, 263 Ga. 703, 705 (438 SE2d 68) (1994); Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.16.10 (4th ed. 2007).

I share the majority's reluctance to overturn a jury verdict. However, I conclude that no rational trier of fact could find, based on the evidence presented at trial, that the State disproved McNeil's claim of self-defense beyond a reasonable doubt. Accordingly, I must dissent.

DECIDED NOVEMBER 3, 2008.

*Tony L. Axam, Danielle P. Roberts*, for appellant.
*Patrick H. Head, District Attorney, Jesse D. Evans, Dana J. Norman, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Elizabeth A. Harris, Assistant Attorney General*, for appellee.